## CLINTON O. DUTCHER
### V.
## THE PEOPLE EX REL.

1. WAREHOUSES—INSPECTORS OF GRAIN.—There can be no legally appointed inspectors of grain except they are appointed by the governor in the manner pointed out in the amendatory act of 1879, § 14.

2. PENALTY FOR ILLEGAL INSPECTION.—The offense created by Sec. 20 of the warehouse law, viz.: assuming to act as inspector of grain without being appointed and sworn, can occur only in a place where there are legally appointed inspectors under the law relating to warehouses.

APPEAL from the County Court of St. Clair county; the Hon. F. H. PIEPER, Judge, presiding. Opinion filed September 29, 1882.

Mr. JOHN B. BOWMAN and Messrs. WILDERMAN & HAMILL, for appellant; that this is a *quasi* criminal proceeding, cited Wiggins v. Chicago, 68 Ill. 375.

The complaint should allege the offense with certainty, describing the particular lot or car of grain inspected, so that the offender might plead it in bar of another suit: C. & A. R. R. Co. v. Howard, 38 Ill. 417.

As to the rule for construing statutes: B. & I. R. R. Co. v. Gregory, 15 Ill. 20; Perteet v. The People, 65 Ill. 232; Zaresseler v. The People, 17 Ill. 104; Mech. Sav. Inst. v. Givens, 82 Ill. 160; Castner v. Walrod, 83 Ill. 179; Thompson v. Bulson, 78 Ill. 277; The People v. Hoffman, 97 Ill. 236; Decker v. Hughes, 68 Ill. 33; Bruce v. Schuyler, 4 Gilm. 211; Potter's Dwarris on Statutes, 189; Dearborn v. Brookline, 97 Mass. 466.

Mr. R. D. W. HOLDER, Mr. M. MILLIARD and Mr. G. F. O'MELVENEY, for appellee.

WALL, J. This was a prosecution against Dutcher in behalf of the People, before a justice of the peace. A fine was there imposed, and from that judgment an appeal was taken

to the County Court of St. Clair county, where the case was tried by consent of parties by the court without a jury.  At this trial the defendant was again convicted and he brings the record here for our examination and judgment.

The complaint alleged that on the 1st day of July, 1882, in said county, the defendant Dutcher " did unlawfully assume to act as an inspector of grain without being legally appointed as such, by inspecting and attempting to inspect divers cars and lots of grain to be received by certain warehouses and elevators in the city of East St. Louis in said county, of class B, contrary to the statute, etc."

A motion to quash the complaint was interposed and over-ruled before the justice of the peace and in the county court, and though this has been the subject of some argument here, we shall pass it by and examine only the merits of the case as disclosed by the evidence.

Upon the trial in the county court the prosecution gave in evidence:

1st.  The charter of the East St. Louis Board of Trade. Private Laws, 1867, Vol. 1, page 852.  Section 1 of this charter provides that certain individuals, naming them, and their associates shall be " A body politic and corporate under the name and style of the 'East St. Louis Board of Trade,' with all the powers and privileges and subject to all the re-strictions of the Chicago Board of Trade as now created by law."  Sec. 2 makes a provision, not important in this con-nection, with regard to the by-laws, and the third and only other section provides that the act shall take effect from its passage.

2d.  The charter of the Board of Trade of Chicago as found on pages 13 to 15, Private Laws, 1859.  Of the various sec-tions of this act it is necessary to quote only the 10th, which reads thus:

" Said corporation shall have power to appoint one or more persons, as they may see fit, to examine, weigh, measure, guage or inspect flour, grain, provisions, liquors, lumber, or any other articles of produce or traffic commonly dealt in by the members of said corporation; and the certificate of such person or in-

spector as to the quality or quantity of any such article, or their brand or mark upon it, or upon any package containing such article, shall be evidence between buyer and seller of the quantity, grade or quality of the same, and shall be binding upon the members of said corporation or others interested, and requiring or assenting to the employment of such weighers, measurers, guagers or inspectors; nothing herein contained, however, shall compel the employment by any one of any such appointee."

3d. The People then proved that on July 1, 1882, in St. Clair county, and since March 1, 1882, defendant acted as an inspector of grain which was received by a public warehouse, of class B, and mixed with the grain of other owners in the storage thereof, and that on and after June 20, 1882, the East St. Louis Board of Trade appointed U. J. Livingston and Henry Benoist as its inspectors of grain, who are ready and willing to inspect all grain going into or out of such warehouse.

The defendant then introduced in evidence the certificate of organization of the "East St. Louis Produce Exchange," a corporation created under the general laws of this State for the purpose of conducting such business as is usual in chambers of commerce and produce exchanges, to avert and adjust controversies liable to arise between individuals engaged in trade, and with a provision giving the Board of Directors the same powers contained in Sec. 10 of the Charter of the Chicago Board of Trade above quoted. The defendant then introduced in evidence his commission or certificate of appointment by the East St. Louis Produce Exchange, as President of its Board of Grain Inspectors, his written appointment by fifty-seven individuals and firms, grain merchants and owners of the warehouses in question, " as their agent and employe to examine and inspect all grain consigned to them at Venice, or East St. Louis, Ill., and to report the condition of the same to them until further notice, using as standards the established grades of the Merchants Exchange of St. Louis."

Also proof that he was an expert grain inspector, and as such employed by the Merchants Exchange of St. Louis, as

well as by the East St. Louis Produce Exchange, and by said individuals and firms, grain merchants, for the purpose of inspecting their grain, under their directions, both before going into said public warehouses, and also often on leaving them; and that under such authority he inspected the grain in question; and that never, at any time, any of said grain inspected by him was bought or sold at any place in charge, or under control of said East St. Louis Board of Trade.

It was also stipulated as a fact: that at the time laid in the complaint, there were no grain inspectors in St. Clair county, appointed and sworn, either as prescribed by chapter 14, Revised Statutes, or by any municipal authority;

And that any private or public act of the General Assembly of Illinois, relating to the inspection of grain might be referred to, and used, in the statement of the case, and on argument, the same as if it had been specially given in evidence.

This prosecution is founded upon the statute commonly known as the Warehouse Law, enacted in 1871, and amended in 1879, (being a part of chapter 114, Revised Statutes) Secs. 19 and 20 of which are as follows:

Sec. 19. "In all places where there are legally appointed inspectors of grain, no proprietor or manager of a warehouse of class B shall be permitted to receive any grain and mix the same with the grain of other owners, in the storage thereof, until the same shall have been inspected and graded by such inspector."

Sec. 20. "Any person, who shall assume to act as an inspector of grain, who has not first been *so appointed and sworn*, shall be held to be an impostor, and shall be punished by a fine of not less than $50, nor more than $100, *for each and every attempt*, to so inspect grain; to be recovered before a justice of the peace."

It is manifest that the offense created by Sec. 20 can occur only in a place "where there are legally appointed inspectors of grain" as this phrase is used in Sec. 19.

The learned counsel for the prosecution concedes this, and thus states the proposition in his printed argument: "If a person acts as an inspector of grain which goes into a public

warehouse in a place where there are legally appointed inspectors, without authority of law, or as a private inspector, the offense is committed, or it is not committed at all." The statute was intended to enforce a legally authorized inspection, if there is any such in the place, and to make private inspection, adopted in its stead, a misdemeanor.

It is admitted that Dutcher did act as an inspector of grain at East St. Louis, without having been first appointed and sworn as contemplated by this statute, and the only question for solution is whether there were then at that place "legally appointed inspectors of grain," within the meaning of Sec. 19. If this question can be answered affirmatively, the defendant was liable to conviction; if it must be answered in the negative, there was no offense.

What, then, is meant by the term "legally appointed inspectors?" What is required to constitute a *legal* appointment? As before stated, this law was originally passed in 1871, and amended in 1879, and was intended to be in pursuance of Art. XIII of the present Constitution. The first section of this act divides public warehouses into three classes, which are designated A, B and C, respectively. The second section defines the classes: A embraces all warehouses, elevators and granaries where grain is stored in bulk, and in which the grain of different owners is mixed together, or stored in such manner that the identity of different lots can not be preserved, such warehouses, etc., being located in cities having not less than 100,000 inhabitants; B embraces all other warehouses, elevators and granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together; C embraces all other warehouses or places where property of any kind is stored for a consideration. By Sec. 14 it was provided that the Governor should appoint a chief inspector of grain for every city in which was located a warehouse of class A. This section was amended in 1879 so as to provide for the appointment, by the Governor, of a chief inspector of grain for every city or county in which was located a warehouse of class A or B, provided that no such inspector for cities or counties in which were located warehouses of

class B should be appointed, except upon the application and petition of two or more warehousemen, doing a separate and distinct business, residing and doing business in such city or county; and when there should be a legally organized board of trade in such city or county, such application and petition should be officially indorsed by such board of trade before such petition should be granted.    The succeeding paragraphs of the section define the qualifications of the chief inspector and his assistants, among which are the taking of an official oath, and the giving of an official bond, and prescribe the duties and services to be performed, with sundry details not important to be further noticed in this connection.    Sec. 14, as originally enacted, was confined in its operation to the city of Chicago, as there was no other city having the requisite population to entitle it to an inspector under that section. Counsel for defendant have argued that there might have been warehouses of class B in Chicago, but we think the position not very well sustained.    The amendatory act of 1879 consists of but two sections.    The first, as has been stated, provides for the amendment of said Sec. 14, and the second is an emergency clause merely, as follows:  " Inasmuch as there is now a large quantity of grain in warehouses of class B, which can have no legal inspection, an emergency exists;  therefore, this act shall be in force from and after its passage."    The great purpose of this amendment, therefore, was to extend the system of  "legal inspection" as exercised under the original act, to warehouses of class B.    It is beyond all doubt that the legislature understood there could be no "legal inspection " pursuant to the warehouse law, without inspectors appointed under that law, and in view of the interpretation thus furnished by the legislature, when we repeat the question, who are  "legally appointed inspectors " within the meaning of Sec. 19, the answer is too apparent to admit of argument that they are such inspectors as are appointed in the manner provided by this amended Sec. 14.    Sec. 20 uses the language, "who has not first been *so appointed and sworn.*" How appointed and sworn?    Manifestly, this also refers to Sec. 14.    We are clear that this Sec. 20 was intended to sup-

plement Sec. 14, so that where there had been an appointment of grain inspectors, pursuant to the latter section, they should have paramount and exclusive control of the subject in their localities, and that in such places the inspection of grain should be wholly under the supervision of the public authorities, and taken entirely out of the hands of Boards of Trade and other private parties. Sec. 20 creates an offense not known before. It is in derogation of common right, and upon familiar and well settled principles should receive a strict construction, and its meaning should not be extended beyond the plain purpose of the legislature in enacting it. To state briefly the substance of what has already been said, this provision is to punish interference with "legal inspection," which is inspection by persons appointed under Sec. 14, and only persons so appointed are within the meaning of the term "legally appointed inspectors," as used in Sec. 19. Now, there was no appointment of inspectors for East St. Louis or St. Clair county, pursuant to Sec. 14; consequently, the offense created by Sec. 20 could not be committed there. The persons appointed by the East St. Louis Board of Trade were not "legally appointed," in the sense here intended. They took no oath, gave no bond, derived no authority from any sovereign or official source, and possessed no compulsory powers. By the very terms of the charter under which they were appointed, their action was binding only "upon the members of said corporation (Board of Trade) or others interested, and requiring or assenting to the employment of such * * * * inspectors; nothing herein contained, however, shall compel the employment by any one of any such appointee," thus limiting their authority to members of the corporation and others assenting, and expressly providing that no one should be compelled to employ them, thus denying them the power to affect the rights of any one not assenting to their action. Certainly, then, these appointees of the East St. Louis Board of Trade have not the authority pertaining to those officials who are appointed in pursuance of Sec. 14 of the Warehouse Law, and though they may be invested with all the powers which the Board of Trade

could give them under its charter, this does not prevent other persons who may have as much authority as they, and no more, from exercising similar functions. Until public inspection shall be inaugurated under Sec. 14, private inspection is lawful; but whenever the public authorities shall assume jurisdiction under this law, then private inspection, whether by agents of the Board of Trade, or other corporations, firms or individuals, will be superseded and excluded, and will become unlawful.

The judgment of the county court is reversed, and as in the view we take there can be no conviction, the cause will not be remanded.

The appellant Dutcher is discharged.

Reversed.